IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| STANLEY G. JOHNSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 04-3438-CV-W-HFS |
| | ) | |
| JO ANNE B. BARNHART, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM AND ORDER**

**I.    Procedural Background**

On May 22, 2003, plaintiff applied for Supplemental Security Income benefits under Title XVI of the Social Security Act ("the Act"), 42 U.S.C. §§ 1381, et. seq[1]. (Tr. 48-51). Plaintiff alleged a disability onset date of November 24, 2002, and in a Disability Report completed on June 7, 2003, plaintiff alleged disability due to pain in his lower back; right knee; right arm and shoulder; spondylothesis[2]; right lumbar; and radiculopathy[3]. (Tr. 48, 73). Plaintiff's application was denied (Tr. 38), and plaintiff timely requested a hearing. A hearing was held on March 24, 2004 (Tr. 310-

---

[1] The ALJ noted that because plaintiff's application proposed an alleged date of disability onset after the date he was last insured for benefits under Title II, it would be considered a claim only for payments under Title XVI of the Act. (Tr. 20).

[2] Forward movement of the body of one of the lower lumbar vertebrae on the vertebra below it, or upon the sacrum. *PDR Medical Dictionary 1st ed. pg. 1656.*

[3] Disorder of the spinal nerve roots. *PDR Medical Dictionary 1st ed. pg. 1484.*

48), and by a decision dated July 23, 2004, the Administrative Law Judge ("ALJ") determined that plaintiff suffered severe impairments of right shoulder and low back pain, but that he retained the residual functional capacity ("RFC") to perform other work which existed in significant numbers in the national economy[4]. (Tr. 22, 28). For the reasons set forth herein, the decision of the ALJ is reversed.

## II.  Factual Background

The facts as set forth in the parties' briefs are thoroughly presented, and will be merely summarized here.

Plaintiff's Testimony

Initially, the ALJ noted a pillow in plaintiff's possession, which plaintiff explained was used due to pain in his shoulder. (Tr. 311). Plaintiff then testified that he was 42 years of age, divorced, and lived with his girlfriend and her 2 children. (Tr. 312). Plaintiff graduated from high school, and his last date of work was in November of 2001, at Lowe's Home Improvement building and installing cabinets . (Tr. 313). Prior to that, plaintiff worked as an assistant manager at E and M Cabinets. (Tr. 314).

In 1995, plaintiff underwent back surgery and returned to cabinet making; he stopped working at Lowe's when he pulled his right shoulder. (Tr. 315). Plaintiff was treated by Dr. Edwards

---

[4]At the outset of his decision, the ALJ noted that plaintiff filed applications for disability benefits on 8 prior occasions with various alleged dates of disability onset. (Tr. 20). All prior applications were denied with the most recent application being dismissed for abandonment at the hearing level on February 24, 1999. (Id).

who restricted him from work for 3 days, and prescribed muscle relaxers and pain pills. (Tr. 316). Plaintiff also went to see Dr. Went; ultimately, plaintiff underwent surgery to repair a tear in his shoulder. (Tr. 317-19). Since the surgery, plaintiff feels a throbbing sensation, and needs to place the pillow under his arm. (Tr. 319-20). Prior to surgery, his arm felt like it was falling off, and medication did not relieve the pain. (Tr. 320). He was able to watch television and take short walks. (Tr. 321).

In 2002, plaintiff hurt his back while helping a friend move a safe out of a closet. (Tr. 320-21). Plaintiff saw a doctor for pain medication, and an MRI showed a slippage at L5. (Tr. 322). Plaintiff takes Oxycontin and muscle relaxers, and estimates that he can sit for approximately 45 minutes. (Tr. 322). Plaintiff attends church, and is assisted with bathing and personal grooming by his girlfriend. (Tr. 323). Plaintiff usually gets up at 6:00 a.m., and takes his medication followed by a cup of coffee; if he feels good he stays up, if not, he lays on the couch for about 1 ½ hours. (Tr. 325-26). This occurs about 3 days a week. (Tr. 326). Plaintiff goes to bed at 9:30 p.m., but cannot sleep through the night; he averages about 5 hours of sleep a night. (Tr. 326). Plaintiff takes a nap during the day for 1 ½ hours. (Id). Plaintiff drives only short distances, i.e. to the store and back. (Tr. 327).

When questioned by his attorney, plaintiff explained that if he holds his arm up, both his arm and his back begin to hurt, and he must lie down. (Tr. 328). Plaintiff testified that side effects from his medication include dry mouth, lightheadedness, drowsiness, fatigue, sweats, and constipation. (Tr. 329). Plaintiff also testified that he experiences pain on a daily basis. (Tr. 329). On a scale of 0 to 10 with 10 being the most painful, plaintiff testified that with medication, his pain is a level 7, and without medication it is a 9. (Tr. 330).

3

Plaintiff injured his right knee while working at a sawmill. (Tr. 330). A graft was surgically taken from the front of the knee, and 2 screws were placed in his knee. (Tr. 331). Plaintiff also sustained injury to his right forearm, requiring 170 stitches, when he was in a car accident. (Id). This resulted in decreased motion, flexibility, and feeling in his right hand. (Tr. 332).

Plaintiff stated that his primary physician was Dr. Howard, however, he disagreed with Dr. Howard's opinion that he could sit for a total of 6 hours in an 8 hour workday; plaintiff estimated that he could sit only 3 hours. (Tr. 333). Plaintiff also disagreed with Dr. Howard's opinion that his ability to reach and handle was unlimited. (Tr. 333-34).

At the conclusion of plaintiff's testimony, the ALJ noted that although plaintiff sustained an injury to his knee 14 years ago, and an injury to his right forearm 18 years ago, he was able to work at Lowe's, and at E and M Cabinets. (Tr. 336).

Vocational Expert Testimony

Vocational expert, George Horne, testified that plaintiff's past work as a deckhand would be classified as semi-skilled, heavy work, but as described, would be very heavy; his past work as a furniture assembler would be classified as semi-skilled, medium work, but as described would be very heavy; past work as a construction worker would be classified as unskilled, very heavy, and similarly described; past work as a cabinetmaker would be classified as skilled, medium work, but described as very heavy; past work as a sales attendant in building materials would be classified as semi-skilled, heavy work, but as described would be very heavy. (Tr. 337-38).

The ALJ asked the vocational expert to consider an RFC in which plaintiff could lift 10 pounds frequently and 20 pounds maximally; sit, stand, or walk for 2 hours in an 8 hour workday

4

with appropriate breaks; could do limited pushing and pulling; and could occasionally climb, crouch, and crawl. (Tr. 338). If the need to stand and walk was not for a continuous 2 hour period, i.e. a sit/stand option, the vocational expert opined that it would preclude plaintiff's past relevant work. (Tr. 338-39). However, plaintiff would be able to perform some light and sedentary unskilled work such as cashier of which there were over 31,000 jobs in Missouri and 1,500,000 nationally. (Tr. 339). Other sedentary, unskilled work included table worker in the production, inspectors, and checkers industry of which there were over 800 positions in Missouri, and 39,000 nationally. (Id). The vocational expert noted, however, that the Department of Transportation ("DOT") did not address whether the table worker position included a sit/stand option. (Id). The vocational expert also advised the ALJ that he had varied from the DOT, and rendered an opinion based on his professional experience and knowledge. (Id).

The ALJ then asked if the vocational expert's opinion would change if plaintiff was restricted to lifting, pushing, or pulling no more than 15 pounds. (Tr. 340). The vocational expert stated that it would not change his opinion. (Tr. 340).

Next, the ALJ asked the vocational expert to consider that plaintiff was able to frequently lift and carry less than 10 pounds 1/3 to 2/3 thirds during a typical day; occasionally lift and carry 10 pounds; stand and walk a total of 3 hours in an 8 hour workday for 30 minutes at a time; sit for a total of 6 hours in an 8 hour workday, continuously for 1 hour; and restricted to using only a 90 degree motion with his upper extremity 50% of the time. (Tr. 340). Also, plaintiff could never climb; could frequently balance and kneel; occasionally stoop, crouch, and bend; and had unlimited ability to reach, handle, see, hear, and speak.(Tr. 341). The vocational expert opined that plaintiff would still be able to perform some light, sedentary unskilled work. (Tr. 342).

5

If, however, plaintiff needed to take more than the usual rest breaks, and needed to use a heating pad, and place pillows under his legs to reduce pressure on his back, the vocational expert opined that it would preclude all work. (Tr. 342-43). Also, if plaintiff suffered the dominant upper extremity limitation as described, the vocational expert opined that it would preclude all work[5]. (Tr. 344).

When examined by plaintiff's attorney, the vocational expert agreed that, according to the DOT, unskilled jobs did not provide a sit/stand option. (Tr. 345). Additionally, both sedentary and light work required that a person be able to sit for 2 hours consecutively, which would not be consistent with a sit/stand option. (Tr. 345-46). Upon further questioning, the vocational expert agreed that, as described in the third hypothetical, if plaintiff were allowed to sit for only 1 hour continuously, it would be inconsistent with social security ruling 83-12 which requires continuous sitting for 2 hours. (Tr. 347). The vocational expert further agreed that if the first and third hypotheticals were qualified so that the individual was required to lie down for 1 ½ hours in both the morning and in the afternoon, all work would be precluded. (Id).

### III.  Standard of Review

The scope of review is whether the decision of the Secretary in denying disability benefits is supported by substantial evidence on the record as a whole. Strong v. Apfel, 122 F.Supp.2d 1025, 1028 (S.D.Iowa 2000); citing, 42 U.S.C. § 405(g). Substantial evidence is less than a preponderance,

---

[5]There was some discussion regarding the credibility of plaintiff's testimony of pain, but the ALJ ultimately concluded that only he could determine questions of credibility. (Tr. 342-43). Plaintiff, however, explained that after surgery was performed on his shoulder, medication failed to alleviate the pain, but wearing a sling provided some relief. (Tr. 343-44).

6

but enough so that a reasonable mind might accept it as adequate to support the conclusion. Strong, at 1028. The court must consider both evidence that supports the Secretary's decision and that which detracts from it, but the denial of benefits shall not be overturned merely because substantial evidence exists in the record to support a contrary decision. Id. When evaluating contradictory evidence, if two inconsistent positions are possible and one represents the Secretary's findings, that decision must be affirmed[6]. Id.

In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record. Strong, at 1029; citing, Wilcutts v. Apfel, 143 F.3d 1134, 1136-37 (8th Ci. 1998).

**IV.     Analysis**

Misstatements of the Record

Plaintiff contends that the ALJ failed to consider the medical evidence in its totality, including his right shoulder injury; degenerative disc changes in his lower back; spondylolisthesis; lumbar radiculitis; osteoarthritis; lack of bilateral manual dexterity; fatigue; and chronic pain resulting in exertional and non-exertional limitations. According to plaintiff, the medical evidence presented was sufficient to find him disabled, and the ALJ's contrary decision was based on misstatements of the record.

---

[6]In Lowe v. Apfel, 226 F.3d 969, 971 (8th Cir. 2000), the Court wrote: "When considering whether the ALJ properly denied social security benefits, we determine whether the decision is based on legal error, and whether the findings of fact are supported by substantial evidence in the record a s a whole." Strong v. Apfel, 122 F.Supp.2d at 1028-29.

7

For instance, the ALJ found there was no record of treatment for the period of March 5, 2002, through January 22, 2003. (Tr. 22). Plaintiff contends that the ALJ failed to consider treatment received by plaintiff on August 9, 2002, in which his right shoulder injury was noted. (Tr. 186). Plaintiff correctly argues that the ALJ failed to consider the August 9th examination, and therefore, misstated the record. Moreover, after finding that plaintiff also suffered from low back pain, the ALJ failed to consider that during the above noted period of time, plaintiff was treated by Dr. Jenny Chandra on December 4, 2002, December 11, 2002, and January 8, 2003, regarding his complaints of low back pain. (Tr. 163-66).

Plaintiff also contends that another example of misstatement occurred when the ALJ found no record of treatment for the period of April 1, 2003, through January 26, 2004. (Tr. 23). Plaintiff argues that contrary to the ALJ's finding, on May 22, 2003, Dr. Chandra noted his right shoulder pain (Tr. 159); on November 25, 2003, he complained of right shoulder pain to Dr. David Rogers (Tr. 298). Additionally, an MRI taken on December 11, 2003, indicated a posterior labral tear (Tr. 206); and on December 16, 2003, plaintiff again complained to Dr. Rogers of right shoulder pain (Tr. 297).

While it is noted that plaintiff correctly points to misstatements of the record by the ALJ, in and of itself, it does not result in a finding of disability.

Credibility

Plaintiff also contends that the ALJ erred in finding that he was not credible regarding his subjective complaints of pain. In assessing a claimant's subjective complaints, the ALJ is required

8

to consider all available evidence on the record as a whole and is required to make an express credibility determination. Dixon v. Barnhart, 353 F.3d 602 (8th Cir. 2003). Because of the difficulty evaluating medical symptoms such as pain and suffering, guidelines have been established for evaluating a claimant's subjective complaints. Dixon, at 605. In undertaking a credibility analysis the ALJ must consider all of the evidence presented relating to subjective complaints, the claimant's prior work record, and observations by third parties and treating and examining physicians relating to the claimant's daily activities; the duration, frequency, and intensity of pain; precipitating and aggravating factors; the dosage, effectiveness and side effects of medication; and functional restrictions. Dixon, at 605; citing, Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).

In further review of the medical evidence, the ALJ noted that, as to plaintiff's complaint of right shoulder pain, Dr. David B. Rogers performed surgery on January 26, 2004, and during a post-operative visit on January 29, 2004, Dr. Rogers' notes indicated that plaintiff was not experiencing much pain. (Tr. 23). As to plaintiff's complaint of back pain, the ALJ considered the notes of Dr. Chandra who first saw plaintiff on December 4, 2002, and after examining plaintiff found negative straight leg raising signs bilaterally, moderately restricted lateral rotation and bending, and 5/5 bilateral upper and lower extremity strength. (Id). Dr. Chandra prescribed Prednisone, Flexeril, Lorcet, and ordered x-rays of the lumbosacral spine. (Id). Although Dr. Chandra's notes of a subsequent visit indicate that plaintiff did not appear to be in as much pain, her notes of the next visit on February 3, 2003, indicate that plaintiff realized no relief from pain despite 2 months of physical therapy. (Id). She therefore, recommended epidural steroid injections, and referred plaintiff to a neurosurgeon, Dr. J. Charles Mace. (Id). After examining plaintiff, Dr. Mace found normal muscle strength in the upper and lower extremities. (Id). When combined with the results of an MRI and x-

9

rays, Dr. Mace's diagnostic impression was degenerative changes of the lumbar spine with no evidence of significant stenosis. (Id).

The ALJ noted that in an insurance statement completed on May 14, 2003, Dr. Chandra stated that plaintiff could not lift, pull or push anything over 15 pounds, and that due to continuous severe pain in his lower back, his ability to sit or stand was limited. (Tr. 24, 197-99). The ALJ also considered a similar statement completed by Dr. Howard on November 4, 2003, in which he stated that plaintiff could not use his right shoulder or right arm, and could not lift due to a right shoulder impingement and back spondylolisthesis. (Tr. 24, 209-12). Moreover, on January 9, 2004, Dr. Howard opined that plaintiff was permanently and completely limited from performing work, and completely restricted from sitting, lifting, and using his right shoulder. (Tr. 24, 210). However, the ALJ noted that in a subsequent Medical Source Statement completed on March 12, 2004, Dr. Howard opined that plaintiff could lift 10 pounds occasionally, and less than 10 pounds frequently; could stand and/or walk a total of 3 hours in an 8 hour workday, but no more than 30 minutes continuously; and could sit for a total of 6 hours in an 8 hour workday, but no more than 1 hour continuously. (Tr. 25, 301-07). This inconsistency, as between Dr. Howard's opinion rendered on January 9, 2004, in which he reported that plaintiff was permanently unable to work, and completely restricted from sitting, lifting, or using his right shoulder, as opposed to his subsequent opinion that while limited, plaintiff had the ability to lift, stand, sit, and walk, was duly noted by the ALJ[7]. It therefore follows that the deference generally given to Dr. Howard as a treating physician was

---

[7]Plaintiff contends that Dr. Howard explained to him that he was unable to address his right shoulder limitations on the medical source statement because this condition was treated by other physicians. (Tr. 26). This contention is unpersuasive, for as properly noted by the ALJ this purported inability did not appear to prevent Dr. Howard from the assessment rendered for the insurance company. (Id).

10

somewhat diminished. Woolf v. Shalala, 3 F.3d 1210 (8th Cir. 1993)[8].

The ALJ also considered the opinion of consulting physician, Dr. Mark Bult, who began seeing plaintiff on November 18, 2003, and noted that plaintiff was not in any acute distress. (Tr. 24, 285). However, after performing facet joint injections, and an epidural steroid injection, on December 3, 2003, and December 30, 2003, Dr. Bulk noted that plaintiff was not achieving good pain relief. (Tr. 264, 266). After performing a sacrolliac joint injection, Dr. Bulk noted that plaintiff obtained good initial relief. (Tr. 262).

After noting the treatments received and notes contained in the medical evidence, the ALJ concluded that plaintiff had a history of injuries which resulted in severe impairments that diminished his functional capacity; however, the ALJ found that, as a whole, the medical evidence did not reflect an individual with the limitations alleged by plaintiff. (Tr. 27). Without expressly stating which, if any, of the medical evidence was supported by the record as a whole, the ALJ noted that it provided "a useful foundation for consideration" of plaintiff's subjective complaints of pain. (Tr. 24).

Notwithstanding the medical evidence on record, the ALJ was required to continue the Polaski assessment. In so doing, the ALJ considered plaintiff's daily activities, and found it interesting that plaintiff listed hunting and fishing among his leisure activities. (Tr. 24). Plaintiff complains, and argues that the ALJ was obligated to query this matter, especially in view of letters

---

[8] In March of 1985, the claimant's treating physician reported that the claimant was capable of gainful employment with some restrictions, and repeated this opinion in July of 1986; yet, in May of 1988, the physician concluded that in view of the claimant's incapacitating pain, he was not capable of gainful employment. Woolf, 3 F.3d at 1214. The Court determined that the latter opinion, based solely on the claimant's complaints of pain, as well as the lack of objective medical evidence to support this opinion, rendered it conclusory and entitled to little weight. Id.

11

from friends who state that plaintiff no longer enjoys these activities. (Tr. 116, 119). In and of itself, the ALJ's observation is not error, for he also noted the third party statements attesting to plaintiff's testimony. (Tr. 25). Other daily activities considered by the ALJ included plaintiff's ability to watch television, take short walks, and short drives, and attend church services; as well as plaintiff's inability to perform household chores, and need of assistance periodically with bathing and grooming. (Tr. 24-25).

The ALJ also noted plaintiff's testimony as to the intensity of his pain which he rated as a 7 with medications, and a 9 without medication; as well as plaintiff's reported sleeping difficulty due to pain. (Tr. 25). Further, the ALJ considered the medications ingested by plaintiff which included steroid medications and OxyContin, and the side effects experienced such as dry mouth, fatigue, constipation, sweating, light-headedness, and drowsiness. (Tr. 25-26). However, the ALJ noted the absence of complaints of side effects in the medical record. (Tr. 26). This was not totally accurate. For in the 3/12/04 medical source statement, Dr. Howard agreed that the side effects reported by plaintiff were medically credible and documented by objective findings. (Tr. 305). As to any functional restrictions, the ALJ properly found the insurance statement in which Dr. Howard opined that plaintiff was unable to work "somewhat at odds" with the medical source statement subsequently completed by Dr. Howard in which he opined that plaintiff was able to sit, stand, and walk for a limited period of time, without any restrictions of plaintiff's ability to reach, handle, finger and feel. (Tr. 26).

Consequently, and contrary to plaintiff's contention, the ALJ did not give "lip service" to

12

the Polaski considerations, but took note of each factor[9]. It has been held that if a claimant's subjective complaints are discounted, the ALJ must discuss the Polaski factors, however, an ALJ need not "discuss methodically each *Polaski* consideration, so long as [the ALJ] acknowledge[s] and examine[s] those considerations." Vonbusch v. Apfel, 132 F.Supp.2d 785, 794 (D.Neb. 2001); quoting, Lowe v. Apfel, 226 F.3d 969, 971 (8th Cir. 2000).

Residual Functional Capacity

Residual Functional Capacity is what the claimant is able to do despite limitations caused by all of the claimant's impairments. Lowe v. Apfel, 226 F.3d at 972. "The RFC is used at both step four and five of the evaluation process, but it is determined at step four, where the burden of proof rests with the claimant." Goff v. Barnhart, 421 F.3d 785, 793 (8th Cir. 2005); see also, Sultan v. Barnhart, 368 F.3d 857, 864 (8th Cir. 2004) (in determining a claimant's RFC, the ALJ must assess the medical records, observations of treating physicians and others, and an individual's own description of his limitations).

Here, the ALJ determined that plaintiff retained the RFC to lift and/or carry 10 pounds occasionally (up to 1/3 of an 8 hour workday) and less than 10 pounds frequently (up to 2/3 of an 8 hour workday). (Tr. 27). The RFC also included plaintiff's ability to stand and/or walk for a total

---

[9]Plaintiff's assertion that the ALJ erred in failing to consider his approval for Medicaid is unpersuasive, and his reliance on Morrison v. Apfel, 146 F.3d 625 (8th Cir. 1998) fails to save his argument. For, in Morrison, the ALJ was held to have committed error by failing to address the finding of the Department of Veteran's Affairs that the plaintiff was permanently and totally disabled. Morrison, at 628 (an extensive physical examination documenting Morrison's medical problems, followed by a finding of a permanent and total disability by another government agency, all of which occupies some thirty pages in the record, merits more than simply an implicit rejection).

13

of 3 hours in an 8 hour workday, but no more than 30 minutes continuously, and his ability to sit for 6 hours in an 8 hour workday but for no more than 1 hour continuously. (Id). This RFC essentially mirrors the restrictions as set forth in the medical source statement completed by Dr. Howard. (Tr. 302-03).

Plaintiff contends that the ALJ failed to properly determine his RFC because he failed to consider plaintiff's need to lie down, lack of bilateral manual dexterity, side effects of medication, fatigue, and chronic pain. The ALJ found that, notwithstanding plaintiff's claimed need to lie down during the day, the medical evidence of record did not mention such a need. (Tr. 26). Contrary to the ALJ's determination, the fact that no physician recommended that plaintiff lie down is not inconsistent with his stated need to lie down, for the need to lie down is a symptom, not a treatment. Holmstrom v. Massanari, 270 F.3d 715, 722 (8th Cir. 2001)[10]. As to manual dexterity, the ALJ noted that while plaintiff complained of loss of strength and feeling in his right arm and hand, plaintiff's treating physician, Dr. Howard, stated that plaintiff was unlimited in his ability to reach, handle, finger, and feel. (Tr. 25). As previously noted, the ALJ's finding that any complained of side effects from medication were not reported on reports submitted by treating and examining doctors, was in error.

Plaintiff also correctly argues that while the ALJ recognized OxyContin as one of plaintiff's medications, the record does not indicate that the ALJ considered that it is prescribed for "the management of moderate to severe pain when a continuous, around the clock analgesic is needed for an extended period of time." Bowman v. Barnhart, 310 F.3d 1080, 1083 (8th Cir. 2002); quoting,

---

[10]It is true, however, that intermittent resting is generally consistent with the lifestyle of the unemployed, and that a claimed physical imperative may be viewed with some skepticism. Lack of reporting a "symptom" may be a factor in rejecting a claim of necessity.

14

*Physicians' Desk Reference (PDR) 516 (5th ed. 2002)*. That being said, however, the ALJ concluded that plaintiff had a "history of injuries resulting in severe impairments which clearly have diminished his functional capacity." This conclusion therefore contradicts plaintiff's allegation that the ALJ completely ignored his complaints.

It follows, therefore, that in support of this finding, the ALJ properly submitted hypotheticals to the vocational expert that mirrored his findings of credible complaints[11]. Goff v. Barnhart, 421 F.3d at 794; see also, Hunt v. Massanari, 250 F.3d 622, 625 (8th Cir. 2001) ("A hypothetical question posed to the vocational expert is sufficient if it sets forth impairments supported by substantial evidence in the record and accepted as true.") It has also been held that an ALJ may rely on a vocational expert's response to a properly formulated hypothetical question to meet his burden of showing that jobs exist in significant numbers which a person with the claimant's RFC can perform. Sultan v. Barnhart, 368 F.3d at 864.

Further review is necessary however, where as here, the vocational expert substitutes his or her own experience in direct contravention of social security rulings. Based upon the ALJ's hypothetical which included plaintiff's ability to *inter alia* sit for 2 hours continuously in an 8 hour day, i.e. a sit/stand option, the vocational expert opined that although plaintiff could not perform his past relevant work, he could perform some light and sedentary unskilled work. (Tr. 338-39). Examples of such work included cashier, and table worker, and the vocational expert stated that his

---

[11] Plaintiff complains that when the ALJ included the need to take rest breaks beyond the normal breaks permitted, with intermittent use of a heating pad and pillows under the legs to help reduce pressure on the back, the vocational expert opined that all work would be precluded. (Tr. 342-43). However, the ALJ was only required to submit those findings supported by substantial evidence in the record, and any agreement noted by Dr. Howard was diminished by his contradictory opinions.

15

opinion was based on his "professional experience and knowledge." (Tr. 339). Upon further questioning, and a hypothetical question in which plaintiff was restricted to sitting continuously for only 1 hour at a time, the vocational expert opined that the aforementioned jobs could still be performed by plaintiff. (Tr. 340-42).

Plaintiff's counsel pointed out that pursuant to Social Security Ruling 83-12 ("SSR 83-12"), unskilled jobs did not offer a sit/stand option. (Tr. 345). SSR 83-12 explains that professional or managerial jobs allow a person to sit or stand with a degree of choice[12]. Stoglin v. Apfel, 130 F.Supp.2d 1060, 1067 (S.D.Iowa 2000). Unskilled jobs, on the other hand, "are particularly structured so that a person cannot ordinarily sit or stand at will." Stoglin, at 1067. After reading the ruling, and further questioning by counsel, the vocational expert agreed that, as posed in the hypothetical, sitting for 1 hour continuously would be inconsistent with SSR 83-12. (Tr. 347). Thus, in order to accommodate plaintiff's need for a sit/stand option, plaintiff would not be able to perform other jobs existing in the light, unskilled sedentary category.

It has been held that Social Security Rulings are binding on all components of the Administration, and the agency's failure to follow its own binding regulations is a reversible abuse of discretion. Stoglin, at 1067. Assuming plaintiff is limited to unskilled work, given the binding instructions in SSR 83-12, and given the evidence in the record noting plaintiff's limited ability to

---

[12]In some disability claims, the medical facts lead to an assessment of RFC which is compatible with the performance of either sedentary or light work except that the person must alternate periods of sitting and standing. Stoglin v. Apfel, 130 F.Supp.2d at 1067. The individual may be able to sit for a time, but must then get up and stand or walk for awhile before returning to sitting. Id. Such an individual is not functionally capable of doing either the prolonged sitting contemplated in the definition of sedentary work (and for the relatively few light jobs which are performed primarily in a seated position) or the prolonged standing or walking contemplated for most light work. Id. (Persons who can adjust to any need to vary sitting and standing by doing so at breaks, lunch periods, etc., would still be able to perform a defined range of work.) Id.

16

sit and stand for long periods of time, thereby precluding his ability to perform either light work or sedentary work, the ALJ should have found plaintiff disabled.[13] Whether plaintiff, as a high school graduate with some managerial experience, is as limited in his inherent capacity as that category assumes, is somewhat doubtful.

Accordingly, it is hereby

ORDERED that plaintiff's request for judgment is GRANTED, and the decision of the Commissioner of Social Security is REVERSED. The above captioned case is REMANDED to the Commissioner for reconsideration consistent with this opinion, pursuant to 42 U.S.C. § 405(g). The clerk is directed to enter judgment in favor of plaintiff.

       /s/ Howard F. Sachs
       HOWARD F. SACHS
       UNITED STATES DISTRICT JUDGE

February 16, 2006

Kansas City, Missouri

---

[13] I note, however, contrary to the record here, that some light work or sedentary work has been identified that does not require prolonged inactivity. See, e.g., Misner v. Chater, 79 F.3d 745, 746 (8th Cir. 1996).